UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY



| | |
|---|---|
| UNITED STATES ex rel.<br><br>S/N PRECISION ENTERPRISES, INC.<br>D/B/A PACAMOR KUBAR BEARINGS<br><br>BRINGING THIS ACTON ON<br>BEHALF OF THE UNITED STATES<br>OF AMERICA<br>c/o Christopher J. Christies<br>Acting United States Attorney<br>970 Broad Street, 7th Floor<br>Newark, NJ 07102<br><br>-and-<br><br>c/o Alberto Gonzales<br>Attorney General of the United States<br>Department of Justice<br>950 Pennsylvania Avenue<br>Washington, D.C. 20530<br><br>            Plaintiffs,<br>-against-<br><br>AXSYS TECHNOLOGIES, INC.<br><br>            Defendant. | Civil Action No.: 06-5538 (FSH)<br><br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMAND** |

## COMPLAINT FOR VIOLATIONS OF
## FEDERAL FALSE CLAIMS ACT

Plaintiff, S/N Precision Enterprises, Inc. d/b/a Pacamor Kubar Bearings, (hereinafter "Relator" or "S/N Precision"), by and through its attorney, Glenn H. Ripa, complaining of Defendant AXSYS Technologies, Inc., hereby alleges as follows:

1- This is an action brought pursuant to 31 U.S.C. §3730(b) to recover damages and civil penalties on behalf of the United States of America arising from false claims made by AST Bearings, a division of the Defendant corporation, AXSYS

Technologies, Inc., in violation of the Federal False Claims Act, 31 U.S.C. §3729, as amended. This action further seeks to recover damages and equitable relief on behalf of S/N Precision arising from the company's personal knowledge of the importing and ball bearing industry.

## PARTIES

2-   S/N Precision is a New York corporation with its principal place of business located at 145 Jordan Road, Troy, New York 12180.

3-   Upon information and belief, AXSYS is a Delaware corporation with its principal place of business located at 175 Capital Boulevard, Rocky Hill, Connecticut.

4-   Upon information and belief, AST Bearings is a wholly owned and controlled division of AXSYS Technologies, Inc., and not a separate and distinct legal entity.

5-   Upon information and belief, AST Bearings principal place of business is located at 115 Main Road, Montville, New Jersey 07045, District of New Jersey. AXSYS Technologies, Inc. and its division, AST Bearings, are hereinafter collectively referred to as ("AST").

## JURISDICTION

6-   The court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732.

7-   The amount in controversy exceeds $75,000.00, exclusive of interests or costs.

## VENUE

8-   Venue in the District of New Jersey is proper pursuant to 28 U.S.C. §§1391(b) and (c).

9-   Upon information and belief, Defendant AST is located and transacts business in the State of New Jersey, District of New Jersey.

## STATUE OF LIMITATIONS

10-   The 10-year statute of limitations applies based on 31 U.S.C. §3731(b)(2) in that the facts material to the right of action were not known by the United States government more than three (3) years prior to the filing of this action.

## FACTS

11-   S/N Precision is an American-owned domestic producer and seller of miniature and instrument ball bearings to customers in the United States.

12-   AST is a purchaser and importer of foreign-produced miniature and instrument ball bearings. AST resells said ball bearings to purchasers in the United States.

13-   AST has and continues to market itself as the exclusive U.S. stocking distributor for EZO/Sapporo Precision, Japan (hereinafter "Sapporo"), of a specific type of ball bearing produced by Sapporo in Japan (hereinafter "EZO" miniature and instrument ball bearings) and exported to the United States. The Department of Commerce, International Trade Administration (hereinafter "Commerce" or "DOC"), conducted administrative reviews of three Japanese ball bearing exporters, Kita Nihon Seiki., Co. Ltd., Sapporo Precision, Inc. and Sanbi Co. Ltd., in order to determine the amount of antidumping duties or "margin" that should be assessed under U.S.

antidumping laws (19 U.S.C. §§1673-1673h) on the bearings sold and exported by said companies and imported into the United States. In response to Commerce's questionnaires to these three entities, it received one consolidated response in which the companies acknowledged their affiliation with one another. Given these affiliations, Commerce calculated a single weighted average margin for their sales in the United States and referred to them collectively as Sapporo throughout the agency's notice published in the Federal Register.

14- According to the documents filed with U.S. Customs and Border Protection (hereinafter, "Customs" or "U.S. Customs"), AST purchases, imports and resells the subject EZO miniature and instrument ball bearings in the United States. However, said ball bearings are said to be produced by Koyo Seiko Co. Ltd. and imported through Sanbi or other suppliers in Japan, not Sapporo.

15- In accordance with its statutory and regulatory authority, Commerce has the authority to direct U.S Customs to collect antidumping duties assessed upon foreign-made goods, including miniature and instrument ball bearings such as EZO ball bearings, imported into the United States.

16- Antidumping duties that are assessed by the DOC upon foreign-made goods imported into the United States are collected by U.S. Customs in addition to any regular import duties assessed upon such goods, and are intended to offset the amount by which such imported goods are sold at less than fair value, that is, the difference between the higher value at which such goods are sold in their home market (normal value) and the lower value at which such goods are sold in the United States.

17- The DOC initiates an antidumping investigation upon the petition of an interested domestic party. During the investigation, the DOC assigns individual antidumping "cash deposit rates" or margin to each identified producer or reseller of goods subject to the investigation, and also establishes a cash deposit rate for "all other" producers or resellers of the goods. U.S. Customs collects the assigned cash-deposit rates at the time of entry of the goods into the United States.

18- If the DOC determines that dumping exists and the United States International Trade Commission (hereinafter "ITA") determines that there is injury to a United States industry, then the DOC issues a final antidumping order under which antidumping duties are assessed and collected at the cash-deposit rates ultimately determined and assigned to each identified producer or reseller. If the producer of the goods exported by a reseller without its own rate is identified, then the producer's rate applies to the reseller's goods. If the producer is not identified by a reseller without its own rate, then the rate assigned to "all others" applies.

19- After one year from the month that the antidumping order is published, and annually thereafter, any interested party may request administrative reviews of imports from a particular producer or reseller during the prior year. Affected entries are suspended until a determination is made by the DOC following such review. If no review of a particular producer or reseller is requested, previously established rates will continue to apply. The rates calculated for each respondent in the administrative review also serve as the new cash-deposit rate for entries of subject merchandise filed after the date of publication of the final results of the review.

20- Under the DOC's clarification of its rules effective May 1, 2003, if an administrative review of a producer of covered goods is requested by an interested party, then all of the producer's sales, including any sales to resellers, are investigated by the DOC unless the reseller has its own rate and the covered goods were sold to the reseller by the producer without knowledge that the covered goods were destined for the United States.

21- If pursuant to an administrative review, the DOC determines that the producer knew or should have known that the merchandise it sold to the reseller was destined for the United States, then the producers' rate as determined by the DOC will apply to the reseller's goods. If the DOC determines that the producer did not know that the merchandise it sold to the reseller was destined for the United States, however, then either the reseller's rate or, if none, the "all other" rate will apply to the reseller's goods.

22- From the period of May 1, 1996 and to and including April 30, 1999, Sapporo Precision did not have a specific antidumping duty rate assigned to it for goods that it produced and were entered into the United States. However, Japanese manufacturers in general, including Sapporo, had a high antidumping rate or margin under the "all other" cash deposit rate. There were a few Japanese manufacturers which were not involved in dumping practices and were assigned a lower duty rate such as Koyo Seiko Co. Ltd., Sapporo on the other hand, was well-known for their dumping practices. Accordingly, if Sapporo Precision directly exported its miniature and instrument ball bearings to the United States during that time, its product would have been subject to the higher "all other" cash-deposit rate that was in effect.

23- The "all other" cash-deposit rates in effect during the years referred to in paragraph 22 were as follows:

(a) <u>May 1, 1996 - April 30, 1997</u>:   *45.83% ad valorem*

(b) <u>May 1, 1997 - April 30, 1998</u>:   *45.83% ad valorem*

(c) <u>May 1, 1998 - April 30, 1999</u>:   *45.83% ad valorem*

After the Department of Commerce's administrative review of Sapporo, the Government imposed an even higher antidumping duty rate on Sapporo in particular and those Sapporo rates were as follows:

(d) <u>May 1, 1999 - April 30, 2000</u>:   *73.55% ad valorem*

(e) <u>May 1, 2000 - April 30, 2001</u>:   *73.55% ad valorem*

24- Upon information and belief, Sapporo and AST entered into a scheme to avoid and/or circumvent the "all other" 45.83% and the specific Sapporo rate of 73.55% *ad valorem* that would have applied to entries into the United States of Sapporo's miniature and instrument ball bearings at said times.

25- Upon information and belief, rather than directly exporting its miniature and instrument ball bearings to the United States, Sapporo manufactured and delivered complete or substantially complete miniature and instrument ball bearings to Koyo Seiko Co., Ltd. (hereinafter "Koyo") another Japanese producer and exporter of miniature and instrument ball bearings. Sapporo instructed Koyo to return the bearings it did not order to Sanbi Co., Ltd (hereinafter "Sanbi"). Sanbi then exported the miniature and instrument ball bearings that Koyo returned to it to AST in the United States and represented that the ball bearings were produced by Koyo or other Japanese entity which

–7–

had a low antidumping duty rate or margin that applied to Koyo, rather than the substantially higher rate antidumping duty rate that applied to Sapporo. During this time, AST may have also been falsely using other Japanese company names other than Koyo, which also had low duty rates.

26- Upon information and belief, AST knew that the miniature and instrument ball bearings that it received from Sanbi at that time were produced by Sapporo, and not by Koyo or any other Japanese manufacturer, for sale in the United States.

27- Upon information and belief, as the self-described exclusive U.S. stocking distributor for EZO/Sapporo Precision (Japan) precision bearings, AST was aware that the miniature and instrument ball bearings that it received from Sanbi were, in fact, EZO miniature and instrument ball bearings produced by Sapporo.

28- Upon information and belief, in furtherance of their illegal scheme to evade the respective 45.83% and 73.55% *ad valorem* antidumping duties assessed by the DOC on the importation and entry into the United States of EZO miniature and instrument ball bearings (described above in paragraph 23), AST with the knowledge and assistance of Sapporo, misrepresented to Customs the origin of the miniature and instrument ball bearings by falsely identifying Koyo and/or other Japanese manufacturers, and not Sapporo as the producer of the miniature and instrument ball bearings, although it knew that those miniature and instrument ball bearings were produced by Sapporo.

29- During the period of time in question, specifically May 1, 1996 - April 30, 2001, the cash-deposit rate for Koyo was as follows:

–8–

 (a) <u>May 1, 1996 - April 30, 1997</u>:  *6.17% ad valorem*

 (b) <u>May 1, 1997 - April 30, 1998</u>:  *7.23% ad valorem*

 (c) <u>May 1, 1998 - April 30, 1999</u>:  *5.39% ad valorem*

 (d) <u>May 1, 1999 - April 30, 2000</u>:  *10.10% ad valorem*

 (e) <u>May 1, 2000 - April 30, 2001</u>:  *7.68% ad valorem*

30- Upon information and belief, as a result of these misrepresentations and deceptions, AST was able to enter EZO miniature and instrument ball bearings into the United States by paying the lower Koyo or other Japanese manufacturer cash-deposit rates (listed in paragraph 29) instead of the higher Sapporo rates (listed in paragraph 23). The difference between the two is as follows:

 (a) <u>May 1, 1996 - April 30, 1997</u>:  *39.66% ad valorem*

 (b) <u>May 1, 1997 - April 30, 1998</u>:  *38.60% ad valorem*

 (c) <u>May 1, 1998 - April 30, 1999</u>:  *40.44% ad valorem*

 (d) <u>May 1, 1999 - April 30, 2000</u>:  *63.45% ad valorem*

 (e) <u>May 1, 2000 - April 30, 2001</u>:  *65.87% ad valorem*

31- Upon information and belief, as a result of these misrepresentations and deceptions, AST marketed and sold the EZO miniature and instrument ball bearings to consumers in the United States at a price below which AST would have been able to market and sell those bearings if AST had paid the proper antidumping duties for those ball bearings.

32- Upon information and belief, and during the period of May 1, 1996 - April 30, 2001, AST imported approximately $2.5 million dollars (per year) of EZO miniature

and instrument ball bearings and entered them at the lower Koyo rate. Accordingly, and with respect to the subject time periods discussed (May 1, 1996 - April 30, 2001), AST evaded the Customs antidumping duties in the following amounts:

(a) May 1, 1996 - April 30, 1997:   $991,500.00

(b) May 1, 1997 - April 30, 1998:   $965,000.00

(c) May 1, 1998 - April 30, 1999:   $1,011,000.00

(d) May 1, 1999 - April 30, 2000:   $1,586,250.00

(e) May 1, 2000 - April 30, 2001:   $1,646,750.00

33- Upon information and belief, AST evaded paying the U.S. government approximately $6,200,500.00 in Customs antidumping duties by misrepresenting the origin of the miniature and instrument ball bearings by mislabeling and/or failing to identify Sapporo as the producer of the ball bearings. AST knew that those miniature and instrument ball bearings were produced by Sapporo since: (a) Only a handful of companies can produce miniature and instrument ball bearings of this type world-wide and each and every one of them is well known by every one in the industry including AST; (b) Koyo never produced these types of ball bearings; (c) Sapporo has always been AST's source of supply for these types of ball bearings long before the antidumping duties were imposed; and (d) Once the antidumping duty rates were reduced, AST ended the facade of using the shell companies to import through and returned to importing directly from Sapporo. This whole scheme was intentionally devised by AST to defraud the United States Government by evading the lawful antidumping duties that U.S. Customs should have collected on bearings manufactured by Sapporo and/or other

Japanese manufacturers, and to gain an unfair competitive edge over United States companies. The United States government imposed these high antidumping duties against Sapporo and other Japanese manufacturers to prevent these types of foreign entities from gaining an unfair advantage over the U.S. manufacturers of these types of ball bearings by selling their bearings in the United States at less than their fair value. AST's scheme was a fraudulent attempt to circumvent the very reason that the U.S. antidumping law was enacted, that is, to prevent foreign products from being sold in the United States at less than their fair value and thereby injuring U.S. industry.

34- Title 31 U.S.C. §3729, The False Claims Act, provides that any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $10,000.00 for each such claim, plus three times the amount of the damages sustained by the Government, and attorney's fees. The Act provides that any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action for himself and on behalf of the Government and to share in any recover. The complaint is to be filed under seal for 60 days (without service on the Defendant during such 60-day period) to enable the Government to conduct its own investigation without the Defendant's knowledge and to determine whether to join the action.

35- Based upon these provisions, S/N Precision, the Relator, seeks to recover damages and civil penalties arising from AST's presentation of false claims to the United States Government.

## AS AND FOR A FIRST CAUSE OF ACTION

36- The allegations contained in paragraphs "1" through "35," inclusive, are fully incorporated by reference herein.

37- By engaging in the foregoing activities, AST has falsely designated the origin of miniature and instrument ball bearings in connection with the importation of those goods into the United States, and the subsequent sale of those goods to consumers in the United States.

38- Defendant's deceptions, false designations, false representations and/or false descriptions have caused confusion, mistake or deception as to the origin, sponsorship or approval of their goods.

39- Defendant's deceptions, false designations, false representations, and/or false descriptions have resulted in lost revenues (in the form of customs duties) to the U.S. government.

40- The damages sustained by U.S. Customs due to the evasion of customs duties, is estimated to be around $6,200,500.00.

## AS AND FOR A SECOND CAUSE OF ACTION

41- The allegations contained in paragraphs "1" through "40," inclusive, are fully incorporated by reference herein.

42- Pursuant to 31 U.S.C. §3729(a)(7), the Defendant is liable to the U.S. Government for three times the amount of damages. It is estimated that the Defendant is liable to the government for $18,601,500.00.

## AS AND FOR A THIRD CAUSE OF ACTION

43- The allegations contained in paragraphs "1" through "42," inclusive, are fully incorporated by reference herein.

44- Pursuant to 31 U.S.C. §3729(a)(7), the Defendant is liable to the Government for up to $10,000.00 per fraudulent declaration. Upon information and belief, a breakdown of the false declarations made are as follows:

> (a) 3 shipments per month, 36 shipments per year for 4 years equals 144 fraudulently identified entries over the span of 4 years.

45- Based upon information and belief, the Defendant is liable for $1,440,000.00 in civil penalties.

46- The total liability owed by the Defendant to the U.S. Government is $20,041,500.00.

## AS AND FOR A FOURTH CAUSE OF ACTION

47- The allegations contained in paragraphs "1" through "46," inclusive, are fully incorporated by reference herein.

48- Based upon information and belief, the Defendant, knowingly and/or with reckless disregard for the truth, made false declarations to the U.S. Government by falsely claiming the origin of the subject ball bearings. By its conduct, the Defendant has purposefully avoided its obligation to pay the government the appropriate antidumping duties assessed under the subject antidumping duty order for ball bearings from Japan.

49- The Defendant, by its conduct as described above, is liable for civil penalties, treble damages, attorney's fees and costs for violating the False Claims Act.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against the Defendant as follows:

1-      That Defendant ceases and desists from violating 31 U.S.C. §3729;

2-      That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation of 31 U.S.C. §3729;

3-      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d) of the False Claims Act;

4-      That Relator be awarded all costs and expenses of this action, including attorney's fees; and

5-      That Relator recover such other relief as the Court deems just and proper.

*[signature]*
Glenn H. Ripa, Esq.
*Attorney for the Plaintiff*
225 Broadway Suite 1607
New York, New York 10007
(212) 732-5310

Relator hereby demands trial by jury
*[signature]*
Glenn H. Ripa